Good morning. May it please the court, my name is Brad Anderson. I represent the appellant in this matter, Mr. Haglund, who until just a few years ago, led a very private life, but for these episodes. To try and set the tone for these arguments, I want to quote to two important Washington Supreme Court cases. One is Eastwood, and that's not Clint Eastwood, but his quote was, the right to lead to some reasonable extent a secluded and private life, free from the prying eyes, ears and publication of others. And then LaFollette is another Supreme Court, Washington Supreme Court says, nothing so exclusively belongs to a man, or so personal and valuable to his as his name. His reputation and the character he has built are inseparable connected with it. Others have no right to use or take it without his express consent. I stand here with a weight, this is doing this for 30 years, this is a very important case. I think it's a case that helps us to define what government can and cannot do. I think it's a case that defines the power of government and the reason why the Constitution and the laws that have been implemented to protect those rights are so very valuable. In America, we use the Constitution to protect citizens from government, not the other way around. I think anybody that looks at what happened to my client in this case, first to be targeted, to really be tarred and feathered, and then to have his situation used and his name called the Carl Hagelin Law, not in a positive way. We see victims sometimes have laws named after them. With regard to the torsion interference of a business expectancy claim, can you articulate your theory of damages caused by the defendants? I can. And I want to point out that Washington has a very robust torsion interference claim. I know it's unique throughout the United States, but Washington uses torsion interference on claims against the government. I've been involved with many of these, so it's a very, it's a unique law, and that's why I think Washington is unique. Why don't you answer the judge's question? I will. So the allegations are that he was, first of all, the tenants themselves, he had to give rent concessions to them because of the public, what I would say, bullying, but he had to give concessions to those tenants. Remember, he was going to charge double rent, but after the city came out there and held this public rally. So the theory is that he had to basically back off the expected rent increases, and that's the approximate causation link that you're relying on? That's one of them. We also allege... What's the other one? We also allege that Carl Hagelin, who is a real estate developer in this community, would also had his reputation with banks affected by this. Developers have silent investors, and so other partners that might want to invest money with him or be his partners. Well, recovery for reputational harm has to be tied to pecuniary damages. So I'm focusing on the theory of how the defendants proximately cause any pecuniary damages. And so I wanted to clarify the allegations because the district court said that a plaintiff has not identified any lost profits, increased costs, lost financing, or any single investor or lender who declined to enter into a venture with your client. And as to the backing off rent increases, the district court relied on the fact that plaintiff concedes that he backed off the rent increases himself instead of letting the code enforcement process play out on the violations. Where's the error in that analysis? First of all, the district court's reliance upon the independent business judgment rule is ungrounded because the Supreme Court of Washington in Bloom, Seattle v. Bloom, overturned that and said the independent business rule doesn't apply. But to answer your question more squarely is when you allege at the beginning of a case, you're not sure exactly what the extent of those damages are. What the federal rules require is that you allege what the and through the proof. At some point, when you're through discovery, you're going to have to prove or satisfy that you've lost these profits. So you're saying that the fact that the defendant made public the rent increases caused Mr. Hageland to remit them and get rid of the prices? No, Your Honor, not at all. In other words, the public learning what he was charging as prices, is that intentional interference with valid interests? Absolutely, Your Honor, because To make your price known, you have a private right not to have your price known in transactions? What we're alleging is that he did, when he raised the rent double, is what he did, which is his practice, when he buys an old dilapidated apartment building, he raises the rent so that he's going to renovate it. If tenants have to move out, it makes it easier to renovate it, so It's his practice, it's well-known, right? Yes. So what's he complaining about when somebody points out that's his practice, it's well-known? Because when the city pays for tenants, both current tenants and other tenants, to come out and rally against him, and then what they say And make his practices known? Well, I don't think anybody wants to know that your practices are that you're going to double the rent, but they didn't tell the full story, what the city did, because they were looking for somebody to make an example, because what he did was legal, he increased the rent, I don't think he needs to have the whole public out there knowing that he's increased the rent No, he's in business, why is prices a secret? I don't, it certainly wasn't a secret with the tenants, because it was lawful, but when you go out and you describe a person as a rat, and you go out and describe somebody Are you talking, is this defamation? No, this is not a case of defamation Then let's leave, that's one side, well go ahead with your argument, I'm just puzzled Well, I want to make sure I squarely answer yours, because that's why I'm here, but I think it's, the fact that the price is doubled, but when you go out there and say, and first of all you target, and you come up with 225 violations, and you're doing this all as a campaign, a systematic approach Did you claim the violations were malevolently found, and did not exist? Yes, yes Well then, that's a different claim, that would be a claim against the city Yeah, well, it's a claim against the city, that's our claim Is that part of your case here? What's that? Is that part of your case here? Yeah, yeah, we've alleged that, is that, first of all, remember your honor, when my client bought this property in August of 2015, it passed the city's inspection, and then when he bought it, he increased the rent double, because he was going to improve all of these The city went back and found a different Yes A different group of violations, and your claim is those violations didn't occur? A lot didn't, yes And were maliciously found for political and devious purposes? I wish I could say it as well as you just did, but that's exactly what we're trying to say Well, maybe you should have said that in your complaint We do, your honor, it's laid out there very clearly, is that these were, we say the word trumped up, you said malicious, I think it's the same, is that we absolutely are saying that because a city council member, several of them, wanted to create this monster, that they first had to create the monster, so after it just cleared the inspections, I mean it got a clean bill of health, six weeks later, when they're looking for somebody to try to have a campaign about, your honor, you go in there and we say trumped up, they had never sent out an army of inspectors, they had never before inspected every apartment unit that he had Yes, we say that most of these were made up, they were double counted, we're not saying all of them, of course there's going to be some minor violations, if you pull over a truck on the side of the road, there's going to be a couple things that are a violation, but part of our allegation is that these were trumped up, because what they were trying to do, they didn't care about the truth, what they were trying to do was create a monster that they could then put on a poster and say this is what we're trying to stop, and so yeah, that's part of our allegation, it was a systematic approach, it's exactly what happened in Squaw Valley, this Ninth Circuit Court case here, is where you're going out and with a pretext, and your honor, that's what we're saying, and pretext always has to be There's no defamation claim alleged, is that right? We dropped the defamation case, your honor, I never liked defamation, because truth, it's a subjective thing about whether somebody is or is not a slumlord, so this is not a defamation case, this is a case against the government having overstepped its bound, using its powers to, go ahead, your honor You've alleged, you claim, that you've alleged that those 200 some odd violations, a great many of them, were not really violations, they were phony violations, they were maliciously said to be violations, they don't exist, and poor Mr. Hagelund has had to correct those at an expense which he would otherwise not have met, right? Where is that allegation in your complaint? It is, let me spill my water here In the record, it's ER, starts on page 88, so it's page 4 of my complaint, and it goes through pages 90, and I use the words trumped up, and that was part of my whole due process as they went out and persecuted, charged him, and then without his due process, but yes, your honor, he ended up not getting, having to pay any fines, the ones that he could fix, he fixed, the other ones he showed the city, this isn't a problem But he spent some time and effort and treasure in clearing himself, right, and you've alleged those damages existed That's part of our damages claim, but it pales in comparison to the fact that he had to, he lawfully doubled his rent, that was the whole purpose of the Carl Hagelund laws, they wanted to stop the ability to do that, but when he did it, he did it lawfully I thought, as I read your complaint prior to today's argument, I thought the theory was more that there were violations, but they were really minor, and the city essentially put pressure on him that they wouldn't put on other people who were similarly situated, that's kind of the tenure of the complaint, so then that goes to the equal protection claim, your argument today is a little bit different in terms of how you characterize the allegations Well I think the word trumped up, I hope the use of the words trumped up means that a lot of them were false, at least that's our allegation at this stage, which I think has to be believed because it's a motion to dismiss, but no, we talked about a lot of them were multiple, you see the same thing, you count it three times, I mean they were looking for a high number, they'd never seen such a high number, but they were trying to show how rotten this guy was, so they double counted, they come up with a lot of things, the other thing is, our theory is that they had conspired with the tenants, because it was the tenants that went to the city, and the city said, hold on, let's work together to make this happen, so they were trying to make an example of him, but I think the word trumped, at least the way I was trying to use the word trumped up means that these were not legitimate, they were not trying to create a monster that they wanted to use as an example, look at the email, yes, your honor. You claim as approximate cause of clearing the trumped up violations, your man paid money and suffered economic loss, is that correct? That is one of the allegations, but again, your honor, I need to emphasize. And that was in 88 through 90 of your complaint. Yeah, and it's all the way through the complaint, probably when you get into the tortious interference, we talk about that a little bit more, but to answer, and I want to save as much of the rest of my time, but to answer your question, your honor, publicizing the fact that you're doubling rent is okay, but going out at the same time and saying, this is a slumlord, this is a rat, and then you name a law after them. You've withdrawn your defamation case, that's only circumstantial evidence of maliciousness. But we have not withdrawn our privacy claim, which was to use his name, his likelihood to name this law. So I'm going to save the rest of my time. Thank you, your honors. Thank you, counsel. Mr. Mitchell, you can probably tell when I'm interested in it. May it please the court, Robert Mitchell on behalf of the city of Seattle and council member Shama Sawant. This case raises the question of whether someone whose abusive business practices are exposed to public view may censor the political debate that ensues. Can you address the claim that was made by Mr. Anderson, that he actually did allege that there were phony violations made as a result of the city inspection and that it cost him money to clear those phony violations? Taking the second point, first, your honor, I've never before this morning heard a complaint that the cost of remedying the violations, which took Mr. Hagelin several months, they were not cleared until May of 2016, constituted damages that may be recoverable in this action. Would you accept the premise that if a governmental employee makes a malicious and phony claim that a violation exists and the violation doesn't exist and the plaintiff in this case has to spend money convincing that government employee that it doesn't exist, that he's got a claim? Oh, I would agree with that, your honor, but that's certainly not what happened here. And this court is not obliged. It's not a question of what had happened. The question is, was it alleged? No, the allegation is not that the costs of remedying the problems were recoverable from the city. Indeed, the notice of violation was never challenged. Its validity was never questioned. And with respect to whether there's nothing here, I would point to the fact that in this record at SER 15 and following is an emergency order that was issued that required Mr. Hagelin within three days to restore heat in three of these units because it was a health and safety violation that required immediate remedy. Let's tie up what I'm asking you about. Is your position that Hagelin has not alleged any concrete and ascertainable economic damage as a result of having to fix phony violation claims? That's correct, your honor. He's not made that allegation. Nor could he, your honor. And this court is not obliged to credit the characterization of the violations when the notice of violation is itself a part of the record. There are many cases of this court, including the Sprewell case, that hold that where the documents referred to in a complaint are part of the record, the court should look at those documents themselves, not the characterizations or conclusory allegations made about them, to draw conclusions and appropriately resolve a motion such as this. The notice of violation, by the way — But there is indication, I don't know if it's specifically alleged in the Second Roofing in this case, that the initial inspections — that the building had passed initial inspections and it was only on the second round after tenant complaints that these violations popped up. Is that correct? That is correct, your honor. The initial inspection looked at one unit. The second inspection looked at 11 units. And the second inspection did find a multitude of violations. Those are in the record. Those were real violations. They presented serious health and safety concerns. I have to say that the tenants were exercised about the problems in the units more when the rents were doubled than before. With respect to the second inspection of all 11 units? The 11 of the 13, your honor. The 11 of the 13. Was one of the units that was reinspected the unit that was originally inspected? I don't know, your honor. The units that were open for inspection were voluntarily done so by the tenants. That's why the city had to send so many inspectors. There was a coordinated request by the tenants to look at the building as a whole. But you don't know whether the unit that passed inspection the first time was found to have violations the second time? I do not know that, your honor. I don't believe the record reflects that. Maybe Mr. Anderson will enlighten us on that. Right. So as I said, your honor, the question that this case presents is whether someone whose abusive business practices are exposed to public view has the power to censor the political debate that follows from that or to prohibit the use of his name on remedial legislation. The answer to that question is no. Indeed, under our system of government, the answer must be no. Judge Peckman ruled that none of the four claims that are addressed in the city's motion for judgment on the pleadings stated a plausible basis for relief under Twombly and Iqbal. Her ruling was correct in all respects. With respect to Torses' interference, the court knows what the judge said in her order about the absence of any lost profits, increased costs, lost financing, any tenant that withheld rents and so forth. Mr. Hagland conceded that in his brief. He claims that the alleged harm to his reputation and emotional distress suffice to establish Torses' interference. He conceded that there were no increased costs as a result of Salwan's actions? He did. If you look at his brief, your honor, you'll see that. Can you tell me where that is in his brief? Certainly, your honor. Page 12 of his brief. Opening brief? His opening brief, your honor. Read it to me, please. He quotes the very language that Judge Nguyen just quoted and then says, but Hagland sufficiently alleged causation and damages. In his complaint, Hagland alleged that he suffered, quote, public ridicule and ostracization in both his personal life and his business endeavors, close quote. Exhibit B to his complaint details that, quote, Mr. Hagland has been denied or shunned from trade and the community organizations and faced difficulties with key business partners and lending institutions and so forth. It goes on to talk about the emotional distress. So he doesn't mention any increased costs, but he doesn't say I didn't have any increased costs? That's correct, your honor. But with respect to his allegation that emotional distress and reputational harm should suffice, the Washington Court of Appeals said in the Thomas Sadas case, and I quote, in the absence of any pecuniary loss, we hold that Dr. Thomas Sadas's emotional harm and speculative reputational harm are not recoverable under this tort. You substitute Mr. Hagland's name for Dr. Thomas Sadas's, and that resolves his tortious interference claim. With respect to common law misappropriation, Judge Peckman held that alleged misappropriation is not actionable with a publication relates to matters that are in the public interest. This was clearly in the public interest. Indeed, that has to be admitted here. Also, the defendants made no commercial use of Mr. Hagland's name or likeness. That's conceded as well. With respect to the equal protection claim, Judge Peckman held that Mr. Hagland failed to show the requisite level of similarity to alleged comparators. He identified three other slumlords and said one of them was worse overall. But none of them did what Mr. Hagland did, which was to double rents on units with scores of serious health and safety violations. Mr. Hagland also failed to plausibly allege that the enforcement of the city codes was irrational or that it was a pretext for impermissible motive. As this court held in Freeman versus City of Santa Ana, selective enforcement does not make the defendant's action irrational. With respect to due process, Judge Peckman held that Hagland had failed to establish a valid interference or misappropriation claim. So those claims could not form the basis of his claim of due process violations. And even if Mr. Hagland had pleaded a valid state law claim for tortious interference or misappropriation, he did not identify any liberty or property interest protected by the due process clause, nor any governmental action that deprived him of those interests. Paul versus Davis and Siegert versus Gilley both hold that reputational harm is not recoverable as a due process violation. Not only was Judge Peckman's order correct, in addition, independent grounds exist for affirming the dismissal of each of these four claims. With respect to tortious interference, there was no plausible allegation of improper purpose or improper means, rather just a conclusory allegation to that effect, which Iqbal says is not enough. Second, speech that is protected under the Constitution cannot create liability for tortious interference. That's what the Washington Supreme Court held in the Caruso case. Third, the absolute right to discuss matters of public concern and to encourage Mr. Hagland's tenants to demand habitable living conditions trumps any alleged interference with Mr. Hagland's business. That's the teaching of the Tacoma Auto Mall case. And finally, Council Member Sawant had a qualified privilege to speak on a matter relevant to her official duties. That's Wood versus Battleground School District. To overcome that privilege, Mr. Hagland had to show by convincingly clear proof a presence of actual malice, which is knowing falsehood or reckless disregard for the truth. Mr. Hagland did not convincingly allege that. And indeed, Ms. Sawant had no reason to think that what she was saying about him was false. She harbored no doubt whatever that he was a notorious slumlord. With respect to the misappropriation claim, Mr. Hagland had his name, had no commercial or other positive value to appropriate, and the incidental use of his name is protected, as is any use in connection with legitimate mention of his public activities. As a landlord, his activities were public, as Judge Bea pointed out. With respect to the Equal Protection and Due Process Clause, Council Member Sawant enjoys qualified immunity from liability under Section 1983. She committed no constitutional violation, still less a known or obvious violation of Mr. Hagland's constitutional rights. And the city may not be held liable under Monell unless it acted pursuant to an official policy or custom. Mr. Hagland admits that the practice of which he complains began with him in the fall of 2015 and involves no one else. Neither the common law nor the U.S. Constitution supports Hagland's attempt to punish and to suppress political speech. To the contrary, both the common law and the Constitution erect multiple barriers and protections for robust political speech. They stand as bulwarks against abuse of the judicial process through claims such as those asserted here by Mr. Hagland. Judge Peckman's order granting partial summary judgment, or partial judgment on the pleadings, rather, to the city and Council Member Sawant should be affirmed. Thank you. Thank you, counsel. Rebuttal. Your Honor, credibility matters. It matters to me. I went back and looked at the complaint. We don't specifically allege. We say trumped up and we say duplicate. We don't specifically allege that they were false. I think the word trumped up. So I went back and looked at that again. That's what we've alleged there. All 13, but we do say in the same paragraph that they only tested two the first time, which is the pattern of what the city does. They only inspect a couple. But when they came out with their army on the second inspection, they investigated all 13. Your Honor, we don't allege whether they found some in there or not. But I can tell you that they investigated all 13 and they came up with 225 violations. Staying on the tortious interference. Let me ask you, Mr. Anderson, in the second inspection of the one unit that had been inspected before, did they find violations that they hadn't found the first time? We haven't alleged it. My client is saying yes, but that wasn't a specific allegation. I think they found 225. They found something in every one of those units. That would be under Twombly and Iqbal a fact allegation which would not be conclusory from which you could infer maliciousness. I think we've alleged enough that you can infer from that. I take your concession that you haven't alleged that the violations were phony or false and there was no economic damage from the violations. I don't want you to concede the last part of it, but I don't use the words false. We use the words trumped up. But to answer the other question. I don't know what you mean by trumped up. You mean the kind of violations that normally aren't called out as violations, but in this case were called out as violations? Remember, we said that they applied a condominium standard. We've alleged that. So I think that is part of our allegation is that these weren't legitimate violations because they applied a condominium conversion standard. I'll read your complaint to see whether you make the bar. Damages, just to wrap up, is that in Washington, emotional distress is a damage you can get on for tortious interference because it's an intentional tort. Selective enforcement, and then I'll conclude, selective enforcement. The law is very clear in this district is that selective enforcement is fine as long as you don't have a pretext for that. And I think we have alleged sufficient facts to show that there was a pretext for the systematic enforcement and labeling and all these other things. So you can enforce these, but if you enforce it differently and you have a intention or a malintent in doing so, then that falls out of your selective enforcement. I'll conclude with that. I'll say one last thing. First Amendment in this district, they're asking you to say that there's a First Amendment protection for public agents, and the Ninth Circuit has not First Amendment protects public entities such as the city. Thank you. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court. We are on recess until 930 AM tomorrow morning.
judges: Rawlinson, Bea, Nguyen